**Signed and Filed: April 25, 2018**

_HANNAH L. BLUMENSTIEL_
**HANNAH L. BLUMENSTIEL**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>SCOTT A. GROVER,<br><br>　　　　　　　Debtor.<br>_____ | ) Case No. 13-55929 HLB<br>)<br>) Chapter 13<br>)<br>)<br>) |
| BRIAN TURLINGTON,<br><br>　　　　　　　Plaintiff,<br>v.<br><br>SCOTT A. GROVER,<br><br>　　　　　　　Defendant.<br>_____ | )<br>) Adv. Proc. No. 16-05083 HLB<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM DECISION FOLLOWING TRIAL

### I.　INTRODUCTION

This case came before the court on February 6, 2018 for trial on Plaintiff Brian Turlington's First Amended Complaint (the "FAC"). [Dkt. 44.] Mr. Turlington seeks a judgment against Defendant Scott Grover in the amount of $48,799.45, with statutory interest from June 1, 2014, and a determination that the judgment is nondischargeable pursuant to 11 U.S.C.

§§ 523(a)(2)(A), 523(a)(3)(A), 523(a)(3)(B), and 523(a)(6).[1,2] Ms. Linda Sunde appeared on behalf of Mr. Turlington. Mr. David Smyth appeared on behalf of Mr. Grover. The court denied Mr. Grover's motion for a directed verdict at trial. After both sides presented their testimony and evidence, the court took the matter under submission.[3]

This memorandum decision constitutes the court's findings of facts and conclusions of law as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure, which applies in this proceeding pursuant to Rule 7052.

**II. JURISDICTION**

In his Answer to the FAC, Mr. Grover asserted as an affirmative defense: "Neither the Bankruptcy Court nor the U.S. District Court nor any other Federal Court has jurisdiction to try this case in that the only present 'case or controversy' concerns the amount owed on the underlying debt, which involves no federal issues." Answer at 2. Mr. Grover and Mr. Turlington, however, had already consented to entry of final judgment by this court at a scheduling conference on May 3, 2017. To the extent

---

[1] Unless otherwise noted, all statutory citations shall refer to Title 11 of the United States Code, aka the "Bankruptcy Code," and any references to rules shall refer to the Federal Rules of Bankruptcy Procedure.

[2] Mr. Turlington requested attorneys' fees and costs in the FAC but did not pursue the request in his Trial Brief or at trial. Accordingly, the court deems this request waived. In addition, Mr. Turlington requested in his Trial Brief punitive damages, damages for emotional distress, and what appear to be compensatory damages in the form of additional interest on certain loans. He did not, however, request this relief in his FAC. Accordingly, the court will not consider this request.

[3] The court admitted Plaintiff's Exhibits 1 through 33, 35 through 37, and 41. Defendant did not introduce any exhibits.

that Mr. Grover intended to reverse his position with respect to consent to entry of final judgment, he did not assert the affirmative defense in his Trial Brief or at trial, so the court deems it waived.  The court has jurisdiction over this action pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and General Order 24 of the United States District Court for the Northern District of California, as confirmed by the parties' express consent to entry of a judgment by this court.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).  Venue is proper under 28 U.S.C. § 1409(a).

**III. FINDINGS OF FACT**

    **a. Background**

Mr. Turlington graduated from Duke University School of Law in 2000, after a career as a teacher.  He worked two and a half years as an insurance defense attorney before relocating to Monterey County in 2004.  Since then, he has focused his practice on employment law.

In 2008, Mr. Turlington and his wife met Mr. Grover at a concert at Monterey's Golden State Theater.  At that time, Mr. Grover owned the Alternative Café:  a coffee shop, gift shop, art gallery, and performance space.  The Turlingtons became patrons of the Alternative Café and came to know Mr. Grover personally and professionally:  they bought pieces of art from Mr. Grover, invested in a company he owned (Boundward, Inc.), and socialized with Mr. Grover privately and publicly.

About four years after Mr. Turlington and Mr. Grover met, the Golden State Theater caught fire and closed for repairs.  Mr. Grover, a licensed contractor, was hired to do repairs on the

Case: 16-05083   Doc# 53   Filed: 04/25/18   Entered: 04/25/18 11:11:49   Page 3 of 27

building.  At around this time, Mr. Grover expressed to Mr.
Turlington an interest in renting the Golden State Theater to
produce larger events.  Eventually, Mr. Grover formed Golden
State Theater Partners LLC ("GST Partners") and reopened the
venue.  Mr. Turlington invested in GST Partners and helped Mr.
Grover interface with the community:  garnering support from the
city of Monterey and local businesses, and introducing Mr. Grover
to other investors.

Mr. Turlington also introduced Mr. Grover to a friend, Mr.
David Lefkowitz, a music promoter who ran the Warfield Theater in
San Francisco.  Mr. Turlington hoped that Mr. Lefkowitz would
help bring acts to the Golden State Theater.  Though he had only
a 5% stake in GST Partners, Mr. Turlington testified that he had
an emotional investment in the venue; he is a live music fan and
wanted the Golden State Theater to do well.  In an effort to help
Golden State Theater succeed, he made a series of loans to Mr.
Grover and/or GST Partners to help fund the endeavor; e.g. for
legal fees, for deposits for performers, and other last-minute
expenses needed to ensure a show could go on.  Some of those
loans are the subject of this adversary proceeding.

**b.  The Loans**

Mr. Turlington made the loans in question to Mr. Grover
and/or GST Partners between August 30, 2012 – May 9, 2013.  The
parties do not dispute the date, amount, or terms of the loans.
They do dispute whether Mr. Turlington made the loans to Mr.
Grover personally or to GST Partners.  Mr. Grover asserts that
Mr. Turlington made the loans to GST Partners; Mr. Turlington
asserts he made the loans to Mr. Grover.  Regardless of whether

the loans were initially made to Mr. Grover personally or to GST Partners, a subsequent agreement between Mr. Grover and Mr. Turlington (the "Loan Agreement" discussed below) made Mr. Grover personally liable for all of the loans. So, for purposes of this adversary proceeding, the court finds that Mr. Turlington loaned money to Mr. Grover. The court summarizes each loan below.

On August 30, 2012, Mr. Turlington loaned Mr. Grover $3,000 for legal fees. [Ex. 2 at 5.] Mr. Turlington wrote two checks to fund this loan: check number 731 in the amount of $1,000 payable to Parravano Witten, P.C. with a memo "Retainer – Golden State Theater Partners, LLC"; and check number 732 in the amount of $2,000 payable to Scott Grover with a memo "Golden State Theater Partners, LLC for [illegible]." [Id.] Mr. Turlington testified that this was a personal loan to Mr. Grover; that the check to Parravano Witten, P.C. was for a retainer so Mr. Grover could employ Parravano Witten, P.C. to help set up GST Partners, and that the check to Mr. Grover was for legal fees to set up the operating agreement and other documentation for GST Partners. Mr. Turlington did not testify that Mr. Grover made any representations to him with respect to this loan and his ability or intent to repay it.

On September 28, 2012, Mr. Turlington loaned $30,000 to Mr. Grover. A "Promissory Note Secured by Deed of Trust" (the "September 28 Note"), prepared by Mr. Turlington and signed by Mr. Grover on September 28, 2012, memorialized the transaction. [Ex. 4.] Pursuant to the September 28 Note, the loan matured two months later, on December 28, 2012, at which point principal and interest of 10% per annum became due. [Id.] Paragraph 3 of the

September 28 Note states that it is secured in accordance with a concurrent deed of trust. [Id.] On cross-examination, Mr. Turlington testified that he used a template for the September 28 Note, that it was an initial document to memorialize their plan going forward, and that they did not execute a deed of trust. Mr. Turlington wrote three checks to fund this loan: check number 735 payable to Warren Dewey for $20,000 with a memo "for GST/Scott Grover Note"; and check numbers 737 and 738, each for $5,000 payable to Mr. Grover and bearing a memo that stated: "GST/Grover Note." [Ex. 3 at 5.]

Mr. Turlington testified that he made this loan based upon Mr. Grover's representations that he had an investor lined up who was going to give him money (presumably with which he would repay Mr. Turlington) and that Mr. Grover owned an unimproved parcel on Orcas Island, Washington (the "Property")[4] worth in excess of $100,000 that could ultimately provide security for the loan. On cross-examination, Mr. Turlington testified that he did not ask Mr. Grover if the Property was already encumbered by any liens or deeds of trust; that during the time he was loaning money to Mr. Grover, he did not have knowledge of Mr. Grover's personal finances; and that he knew the Golden State Theater was underfunded.

On October 9, 2012, Mr. Grover signed a handwritten note stating that he personally owed Mr. Turlington $2,000 for "cash advance;" $189.61 for Home Depot; and "credit card reimbursement for light guy at Howard Johnson's" (the "October 9 Note"). [Ex.

---

[4] The Property is located at NHN Kellebrew Lake Rd, Orcas Island, Washington, APN # 262250015000.

5 at 1.]  The October 9 Note provided for payment in full with no interest by October 16, 2016, or payment thereafter with 10 percent interest.  [Id.]  The total amount owed to Mr. Turlington under the October 9 Note was $2,314.81.  Mr. Turlington testified that he made this loan because he had in the past loaned small amounts of money to Mr. Grover under similar circumstances in connection with the Alternative Café and that Mr. Grover had paid back many of those loans.  He also testified that he made the loan relying in part on Mr. Grover's representation in connection with the September 28, 2012 loan that the Property could secure it.

On November 8, 2012, Mr. Grover signed a handwritten note stating that he personally owed Mr. Turlington $2,700 for "deposits on Robert Cray Band/Kenny Wayne Shepherd concerts set for November 15, 2012" (the "November 8 Note").  [Ex. 6 at 1.] The November 8 Note goes on to state:  "This amount is on top of $2,000 on 10/9/12 and affiliated credit card charges in that note, plus $30,000 promissory note to be secured by [the Property], all of which will be memorialized in a new note." [Id.]  To fund the November 8 Note, Mr. Turlington obtained two cashier's checks, each in the amount of $1,350 and made payable to William Morris Endeavor Entertainment.  [Id. at 2.]  A memo on one of the cashier's checks stated "Kenny Wayne Shepherd"; a memo on the other stated "The Robert Cray Band."  [Id.]  Mr. Turlington testified that, at the time he made this loan, he and Mr. Grover were engaged in an ongoing conversation regarding securing the loans with the Property.

Case: 16-05083   Doc# 53   Filed: 04/25/18   Entered: 04/25/18 11:11:49   Page 7 of 27

On November 29, 2012, Mr. Grover signed a handwritten note stating that, on behalf of GST Partners, he owed Mr. Turlington $3,000 for a loan to cover an advance for performer John Prine (the "November 29 Note"). [Ex. 7 at 2.] The November 29 Note goes on to state that "Scott will tender $3,000 no later than Friday, December 7, 2012" and that if he does not pay in full by that date, a $10 per day surcharge would be assessed until the loan was paid in full, which must occur no later than December 30, 2012. [Id.]

On December 15, 2012, Mr. Turlington loaned $25,080 to Mr. Grover and/or GST Partners. He funded this loan with check number 756 for $1,680 payable to GST Partners and with a cash withdrawal in the amount of $23,400. [Ex. 9 at 3 and 5.] Mr. Turlington testified that he used the cash to purchase cashier's checks payable to an unspecified performer's management company. He also testified that these were personal loans to Mr. Grover and that he made check number 756 payable to GST Partners by mistake. Mr. Turlington testified that, prior to loaning this money, Mr. Grover provided him with an appraisal dated August 1, 2011 that valued the Property at $125,000. [Ex. 8.] Mr. Turlington testified that Mr. Grover repeatedly assured him that his loans were "safe and secure" because the Property could secure those obligations.

On December 27, 2012, Mr. Turlington signed a handwritten note stating that he lent GST Partners $1,000 as an advance for marketing purposes ("December 27 Note"). [Ex. 10.] The December 27 Note provides that the loan shall be paid in full by close of business on January 15, 2013; otherwise, a $10 per day penalty

would be assessed until the loan was paid in full. [Id.] Mr. Turlington testified that he understood that Mr. Grover personally guaranteed the December 27 Note. He also testified that he and Mr. Grover continued to discuss securing all outstanding loans with the Property.

On January 8, 2013, Mr. Turlington signed a handwritten note stating that he lent Mr. Grover $1,000 for marketing purposes; that the amount was due on January 18, 2013; and that if not paid in full on that date, Mr. Grover would owe an additional $10 per day until it was paid in full ("January 8 Note"). [Ex. 11.] Mr. Turlington did not testify as to any representations Mr. Grover may have made with respect to this loan concerning his ability or intent to repay it or to secure it with the Property or any other collateral.

In early January 2013, when the investment that would repay the $30,000 September 28 Note had not materialized, Mr. Turlington began to investigate the Property to confirm that it had value sufficient to ensure repayment of the loans, which by then totaled approximately $68,000. Mr. Turlington testified that he was exploring his options, including whether to obtain a deed of trust or title to the Property, and that he and Mr. Grover were communicating about these options.

Mr. Turlington readily admitted that he had no experience personally or professionally with real estate transactions or in documenting secured transactions. But he did not seek legal counsel in connection with his loans to GST Partners and/or Mr. Grover until in or around January 2013. Mr. Turlington obtained such advice from Mr. Troy Kingshaven, a business transaction/real

estate attorney employed by Fenton & Keller PC, who identified for Mr. Turlington the steps he needed to take to secure the loans he had made to GST Partners and/or Mr. Grover, such as obtaining a title report and title insurance. Mr. Turlington began researching what these steps would cost and what the closing costs would be if the Property were sold. [Exs. 13-14.] He then obtained a valuation of $92,570 for the Property from the San Juan County Assessor's website. [Ex. 12.]

On February 6, 2013, Mr. Turlington emailed Chicago Title Company requesting a preliminary title report for the Property. [Ex. 15.] In that email he stated: "[H]opefully nothing is recorded against the parcel." [Id. at 2.] Mr. Turlington testified that he received the preliminary title report the same day via email but did not review it because the electronic file was large and had formatting issues that made it difficult to print.

On February 26, 2013, Mr. Turlington loaned Mr. Grover $20,000 for a BB King show at the Golden State Theater. Mr. Turlington testified that he withdrew that amount in cash and gave it to Mr. Grover. [See Ex. 17 at 1; Ex. 18 at 4.] Mr. Turlington did not testify that Mr. Grover made any representations with respect to this loan concerning his ability or intent to repay or to secure the loan with the Property or any other collateral.

On March 10, 2013, Mr. Turlington loaned Mr. Grover $500, which he withdrew in cash from his bank account. [Ex. 17 at 2; Ex. 18 at 4.] Mr. Turlington did not testify that Mr. Grover made any representations with respect to this loan concerning his

ability or intent to repay or to secure the loan with the
Property or any other collateral.

   After Mr. Turlington made the February 26 and March 10 loans
to Mr. Grover, he finally reviewed the title report that he had
received a month earlier.  The title report disclosed a deed of
trust in favor of Cedar Funding Inc. ("Cedar Funding") recorded
against the Property, securing a debt owed by Mr. Grover in the
amount of $100,000.  [Ex. 19A.]  The Cedar Funding deed of trust
had been recorded on June 30, 2005.  [Ex. 20.]

   Mr. Turlington testified that he immediately confronted Mr.
Grover about the Cedar Funding deed of trust, and that Mr. Grover
responded:  "What does that mean?"  Mr. Turlington accused Mr.
Grover of having deceived him:  the loans could not be secured by
the Property because if it were sold, all of the proceeds would
go to Cedar Funding.  According to Mr. Turlington, Mr. Grover did
not have a response to his accusations, other than to say he
would look into the matter.  When Mr. Turlington raised the issue
later, Mr. Grover informed him that there was a way to have the
Cedar Funding deed of trust "removed" because Cedar Funding no
longer existed, and that he was looking into it.

   Mr. Turlington also testified to another conversation with
Mr. Grover about the Cedar Funding deed of trust, which took
place on April 21, 2013.  According to Mr. Turlington, Mr. Grover
represented that he had someone who could "fix the paperwork" so
that the lien could be "removed" and asked Mr. Turlington to "let
it sit" for 90 days while that was done.

   On May 9, 2013, before the issue with the Cedar Funding deed
of trust had been resolved, Mr. Turlington loaned Mr. Grover

Case: 16-05083   Doc# 53   Filed: 04/25/18   Entered: 04/25/18 11:11:49   Page 11 of
27

another $936.34 for an insurance payment.  [Ex. 22.]  After May 9, 2013, Mr. Turlington made no further loans to Mr. Grover or to GST Partners.

### c. The Orcas Island Property

Mr. Grover's Orcas Island property originally consisted of two parcels, one undeveloped (the Property), and one improved with a house, in which his mother lived (collectively, the "Orcas Island Property").  He acquired the Orcas Island Property about 15 years ago, after the previous owner – his mother's landlord – died.  Mr. Grover's mother wanted someone to buy the Orcas Island Property so that she could continue to live there, so Mr. Grover borrowed money from Cedar Funding to make the purchase.  He had no prior experience buying real property and did not consult a lawyer or other real estate professional to help him with the purchase of the Orcas Island Property.

Mr. Grover initially understood that he had transferred title to the Property to Cedar Funding in lieu of a down payment for purchase of the Orcas Island Property.  Rather than taking title to the Property, however, Cedar Funding recorded a deed of trust against the Property – a fact of which Mr. Grover did not become award until much later.

Mr. Grover explained this oversight by admitting that he signed the Cedar Funding deed of trust on June 25, 2005, but that it was among many documents he signed without reading at the time the transaction with Cedar Funding closed.  He received a stack of documents with stickers on the pages he needed to sign, and he simply flipped through the stack and signed where instructed.

Mr. Grover never received a mortgage bill for the Property from Cedar Funding.

Mr. Grover did not learn he held title to the Property until several years later, when he contacted the San Juan County Treasurer ("County Treasurer") about property taxes he had been paying for the improved parcel. According to Mr. Grover, he had discovered that Wells Fargo Bank had also been paying property taxes for the improved parcel and wanted to know why the County Treasurer had been billing him. The County Treasurer informed him that actually, he had been paying property taxes for the Property – not the improved parcel – because he owned it.

Later, he learned that Cedar Funding had collapsed and he assumed that it had made a mistake with respect to the transfer of the Property. Mr. Grover was not paying a mortgage on the Property, but was paying the mortgage on the improved parcel, where his mother lived, until he opened the Golden State Theater. He explained that he did not receive a salary from GST Partners, became unable to pay the mortgage, and filed bankruptcy to stop the pending foreclosure of his mother's home.

### d. The Loan Agreement

On May 21, 2013, Mr. Turlington and Mr. Grover signed a document summarizing the loans identified above and setting forth the terms governing how and when Mr. Grover would repay them (the "Loan Agreement"). [Ex. 1.] The Loan Agreement established the total amount due and owing at $89,531.45. [Id. at 2.]

The Loan Agreement provided that, until the Cedar Funding deed of trust was removed from the Property or otherwise satisfied, Mr. Grover's debt to Mr. Turlington would be secured

Case: 16-05083    Doc# 53    Filed: 04/25/18    Entered: 04/25/18 11:11:49    Page 13 of 27

by 42 works of art owned by Mr. Grover. [Id.] The Loan
Agreement identified and ascribed a value to each piece of art.
[Id. at 2-4.] The parties agreed that the works of art were
worth $63,192, and that $26,339.45 of the debt remained
unsecured. [Id. at 4.]

The Loan Agreement further provided that Mr. Turlington
would return the artwork to Mr. Grover when he had "resolved" the
Cedar Funding deed of trust and had transferred the Property to
Mr. Turlington. [Id.] If that did not occur by August 1, 2013,
Mr. Turlington would keep the artwork and Mr. Grover would owe
him $26,339.45, which Mr. Grover would repay beginning September
1, 2013 with a single payment of $1,339.45 and monthly
installment payments of $2,500 October 1, 2013 through June 1,
2014. [Id. at 4-5.]

Mr. Turlington personally viewed all 42 pieces of art in Mr.
Grover's home at the time he and Mr. Grover signed the Loan
Agreement. Mr. Turlington began taking possession of the artwork
that day, a couple of pieces at a time. When he came back to
pick up additional artwork within a week of signing the Loan
Agreement, however, 18 pieces had gone missing. Ultimately, Mr.
Turlington took possession of only 24 of the 42 pieces of art to
which he was entitled under the Loan Agreement.

After he and Mr. Turlington signed the Loan Agreement, Mr.
Grover did not resolve the Cedar Funding deed of trust or
transfer the Property to Mr. Turlington, did not turn over the 18
missing pieces of artwork, did not make any payments under the
Loan Agreement, and did not contact Mr. Turlington about
repayment. Mr. Grover believed that Mr. Turlington had lost

interest in obtaining payment for the loan, and that once the Golden State Theater shut down, Mr. Grover focused solely on his survival.

Mr. Turlington also introduced the testimony of Mr. Matthew Bucholtz, who had loaned $20,000 to Mr. Grover. This loan was memorialized in a May 9, 2013 email that Mr. Turlington did not introduce as evidence. Mr. Bucholtz testified that Mr. Grover asked for the loan to cover a debt owed by Golden State Theater to a band called "Dead Can Dance." According to Mr. Bucholtz, Mr. Grover agreed to repay the full amount by June 21, 2013, and that Mr. Grover's entire collection of artwork would serve as collateral for the loan.

After Mr. Grover and Mr. Turlington executed the Loan Agreement, but before Mr. Turlington could collect all of the collateral, Mr. Bucholtz went to Mr. Grover's residence and picked up eight pieces of art to secure his loan. Mr. Grover did not tell Mr. Bucholtz that he had promised the artwork to anyone else. Mr. Grover never repaid the loan, and Mr. Bucholtz kept the artwork.

Mr. Grover does not know what became of the other 10 missing pieces of art, although he thought one or two might be in storage or might have been taken by Mr. Turlington. Mr. Grover conceded that he never attempted to retrieve stored artwork for Mr. Turlington.

According to Mr. Grover, when he and Mr. Turlington entered into the Loan Agreement, Mr. Turlington knew about his prior agreement with Mr. Bucholtz because all of them were working together continuously to try to keep the Golden State Theater

Case: 16-05083   Doc# 53   Filed: 04/25/18   Entered: 04/25/18 11:11:49   Page 15 of 27

open.  Mr. Grover admitted, however, that he did not inform Mr.
Turlington of his agreement with Mr. Bucholtz, but repeated that
Mr. Turlington must have known about it because he was deeply
involved in GST Partners.

### e. Remaining Debt Owed to Mr. Turlington

Mr. Turlington seeks a judgment against Mr. Grover in the
amount of $48,799.45, with statutory interest from June 1, 2014.[5]
The amount sought is the different between the $89,531.45
accumulated debt and the $40,372 value of the artwork Mr.
Turlington obtained, plus interest.  [Pltf.'s Trial Brief at 7-
8.]  Mr. Grover does not dispute that the amount of the remaining
debt is $48,799.45 and does not address Mr. Turlington's request
for interest.  [Def.'s Trial Brief at 1.]  The court finds,
however, that the Loan Agreement, which superseded all prior loan
agreements, does not provide for payment of interest on the debt.
[See Ex. 1.]  Accordingly, the court finds and concludes that the
amount Mr. Grover owes to Mr. Turlington is $48,799.45.  While
the court will not award pre-judgment interest, it will award
post-judgment interest at the federal rate of 2.18%.  28 U.S.C.
§ 1961(a) ("[i]nterest shall be allowed on any money judgment in
a civil case recovered in a district court.").

### f. Mr. Grover's Bankruptcy Case

Mr. Grover filed a voluntary petition under Chapter 13 of
the Bankruptcy Code on November 12, 2013, almost five months

---

[5] In his Trial Brief, Mr. Turlington asks the court to award damages for Mr.
Grover's alleged fraud in the form of additional prejudgment interest on
certain loans.  The court will not award the requested damages for two
reasons:  first, as noted above, Mr. Turlington did not request such damages
in his FAC; second, as discussed below, the court does not find that Mr.
Grover acted with fraudulent intent.

Case: 16-05083   Doc# 53   Filed: 04/25/18   Entered: 04/25/18 11:11:49   Page 16 of
27

after he signed the Loan Agreement. [Ex. 23 at 2.] Mr. Grover did not include Mr. Turlington in the creditor matrix, (id. at 7-9) in the Chapter 13 Plan (Ex. 24), or in the schedules listing Mr. Grover's creditors (Ex. 28 at 9-15). Mr. Turlington did not receive notice of Mr. Grover's bankruptcy case or of the deadlines to file a proof of claim or a nondischargeability complaint. [Ex. 25 at 6, 10; Ex, 26; Ex. 27.] The deadline for non-governmental creditors to file a proof of claim expired on April 2, 2014; the deadline to challenge the dischargeability of debts expired on March 3, 2014. [Ex. 25 at 7.] Mr. Turlington did not learn of Mr. Grover's bankruptcy cased until 2016, long after the foregoing deadlines had passed.

The court confirmed Mr. Grover's Chapter 13 Plan on February 5, 2015. [Bankr. Dkt. 52.] Mr. Turlington filed his complaint on November 16, 2016 and his FAC on January 18, 2018. On January 3, 2018, the court dismissed Mr. Grover's bankruptcy case for failure to make plan payments. [Bankr. Dkt. 77.] Given the dismissal of his bankruptcy case, Mr. Grover did not receive a discharge of his debts. The court retained jurisdiction over this adversary proceeding because the parties were very close to trial, and because a judgment in favor of Mr. Turlington on his claims for relief under sections 523(a)(2)(A) and 523(a)(6) would render the debt owed by Mr. Grover nondischargeable in any future bankruptcy case he might commence. In addition, retaining jurisdiction would prevent Mr. Grover from allowing the underlying bankruptcy case to be dismissed to avoid an unfavorable judgment.

## IV. CONCLUSIONS OF LAW

### a. Exception to Discharge under 11 U.S.C. § 523(a)(3)(A)

Section 523(a)(3)(A) excepts from discharge unscheduled debts that are not of the type described in sections 523(a)(2), (a)(4), or (a)(6), where the creditor had no notice or actual knowledge of the case in time to file a timely proof of claim. In re Purcell, 362 B.R. 465, 472 (Bankr. E.D. Cal. 2007).

Here, no one disputes that Mr. Turlington had no notice or actual knowledge of Mr. Grover's bankruptcy case in time to file a timely proof of claim. Mr. Grover did not, however, receive a discharge in his bankruptcy case, so Mr. Turlington's claim for relief under section 523(a)(3)(A) is moot.

### b. Exception to Discharge Under 11 U.S.C. § 523(a)(3)(B)

Section 523(a)(3)(B) excepts from discharge unscheduled debts of the type described in sections 523(a)(2), (a)(4), or (a)(6) where the creditor had no notice or actual knowledge of the case in time to file a timely proof of claim or to timely request a determination of dischargeability of such debt. 11 U.S.C. § 523(a)(3)(B). Whereas section 523(a)(3)(A) provides that a qualified debt is not discharged in the instant bankruptcy case, section 523(a)(3)(B) allows a creditor who has not been timely notified of a bankruptcy case to seek a nondischargeability judgment that would apply to all future bankruptcy cases. In other words, section 523(a)(3)(B) provides an exception to the general rule that a nondischargeability complaint must be filed within 60 days of the section 341(a) meeting of creditors. Irons v. Santiago (In re Santiago), 175 B.R. 48, 49 (B.A.P. 9th Cir. 1994). When section 523(a)(3)(B)

Case: 16-05083   Doc# 53   Filed: 04/25/18   Entered: 04/25/18 11:11:49   Page 18 of 27

1  applies, a complaint may be filed at any time.  Fed. R. Bankr. P.

2  4007(b); In re Santiago, 175 B.R. at 52.

3       Mr. Turlington asserts that the debt owed to him by Mr.

4  Grover is nondischargeable pursuant to sections 523(a)(2) and

5  (a)(6).  Because Mr. Turlington did not have actual notice or

6  knowledge of Mr. Grover's bankruptcy case, the court deems his

7  complaint and the FAC, timely pursuant to section 523(a)(3)(B).[6]

8          **c. Exception to Discharge Under 11 U.S.C. § 523(a)(2)(A)**

9       Section 523(a)(2)(A) provides:  "(a) A discharge under . . .

10  this title does not discharge an individual debtor from any debt—

11  . . . (2) for money, property, services, or an extension,

12  renewal, or refinancing of credit, to the extent obtained by —

13  (A) false pretenses, a false representation, or actual fraud,

14  other than a statement respecting the debtor's or an insider's

15  financial condition."  11 U.S.C. § 523(a)(2)(A).

16       To prevail in a section 523(a)(2)(A) action, a creditor must

17  prove five elements by a preponderance of the evidence:  (1) a

18  misrepresentation, fraudulent omission or deceptive conduct by

19  the debtor; (2) knowledge of the falsity or deceptiveness of his

20  statement or conduct; (3) the debtor made the misrepresentation

21  with the intention and purpose of deceiving the creditor; (4) the

22  creditor justifiably relied on the misrepresentation; and (5) the

23  creditor sustained damage as the proximate result of the

24  misrepresentation.  Turtle Rock Meadows Homeowners Ass'n. v.

25  Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000).  The

26  court narrowly construes section 523(a)(2)(A) in favor of the

27  _____

28  [6] Mr. Grover does not dispute the applicability of section 523(a)(3)(B) to the
    complaint or the FAC.

Case: 16-05083   Doc# 53   Filed: 04/25/18   Entered: 04/25/18 11:11:49   Page 19 of
27

debtor.  Snoke v. Riso (In re Riso), 978 F.2d 1151, 1154 (9th Cir. 1992).

Mr. Turlington extended multiple loans to Mr. Grover based on a general understanding that the Property could serve as collateral for those loans should the need arise.  Mr. Turlington argues that Mr. Grover's failure to inform him of the $100,000 Cedar Funding deed of trust recorded against the Property constitutes a fraudulent omission that justifies a determination that Mr. Grover's debt to Mr. Turlington is nondischargeable under section 523(a)(2)(A).  While that omission was material, Mr. Turlington has not proven by a preponderance of the evidence that Mr. Grover had knowledge of the falsity of his representation that the Property could secure the loans, that Mr. Grover made that representation with the intent to deceive Mr. Turlington, or that Mr. Turlington reasonably relied upon the representation.

Mr. Grover credibly testified to his belief that he had transferred title to the Property to Cedar Funding as part of the transaction in which he bought the Orcas Island Property and that he found out only years later that Cedar Funding had collapsed, and that he still held title to the Property.  He also credibly testified that, even though he signed the Cedar Funding deed of trust, he did not read that document, and instead relied upon Cedar Funding's explanation of the transaction; i.e., that he would be transferring the Property to Cedar Funding in lieu of a down payment for the Orcas Island Property.

Mr. Grover had no prior experience with real property transactions and did not consult a real estate professional or an

Case: 16-05083   Doc# 53   Filed: 04/25/18   Entered: 04/25/18 11:11:49   Page 20 of 27

attorney about his transaction with Cedar Funding.  His failure
to investigate further into the status of the Property was
certainly ill-advised – just as Mr. Turlington's failure to do
any due diligence with respect to the Property until January
2013, and waiting a month to review the preliminary title report
were ill-advised – but Mr. Grover's ignorance does not rise to
the level of fraud.

The court also cannot lose sight of the fact that Mr.
Turlington continued to lend Mr. Grover money **after** he became
aware of the Cedar Funding deed of trust, undercutting his
assertion that he made the loans in reliance upon there being
equity in the Property.  Finally, the court finds that Mr.
Turlington's statement in his email to Chicago Title Company that
"hopefully nothing is recorded against the parcel" demonstrates
that he had misgivings about Mr. Grover's assurances that the
loans were "safe and secure" and therefore cannot be found to
have justifiably relied upon them.

Though Mr. Turlington does not specialize in real estate
transactions, he is a trained and experienced lawyer who had
colleagues in the real estate sector.  Trained lawyers verify
information with documentation.  Mr. Turlington chose not to use
his training and contacts to verify that the Property actually
could secure his loans until January 2013.  He did not even ask
Mr. Grover if there were any liens against the Property.  Given
Mr. Turlington's training, experience, and resources, the court
finds that he did not reasonably rely upon Mr. Grover's statement
that his loans were "safe and secure."  Accordingly, the court
finds and concludes that Mr. Turlington has not satisfied his

Case: 16-05083   Doc# 53   Filed: 04/25/18   Entered: 04/25/18 11:11:49   Page 21 of
27

burden of proving that Mr. Grover's debt is nondischargeable under section 523(a)(2)(A) based upon Mr. Grover's representations regarding the availability of the Property as collateral.

Mr. Turlington also argues that the debt owed to him by Mr. Grover should be deemed nondischargeable under section 523(a)(2)(A) because Mr. Grover fraudulently misrepresented that 42 pieces of artwork would serve as collateral under the Loan Agreement, when he had already promised some of those pieces to Mr. Bucholtz as collateral. Section 523(a)(2)(A) applies not only to money, but also to "an extension, renewal, or refinancing of credit" to the extent obtained by the false representations. Locke v. United States Trustee (In re Locke), 205 B.R. 592, 598 (B.A.P. 9th Cir. 1996).

"Under section 523(a)(2)(A), when a creditor does not advance new money based on a false representation, the creditor must show 'that it had valuable collection remedies at the time of the extension or renewal, that it did not exercise [those remedies] in reliance on the debtor's misrepresentation[,] and that those remedies lost value during the renewal or extension period . . .'" Id. (quoting Cho Hung Bank v. Kim (In re Kim), 163 B.R. 157, 161 (B.A.P. 9th Cir. 1994), aff'd and adopted, 62 F.3d 1511 (9th Cir. 1995).

Mr. Turlington did not advance new money under the Loan Agreement. And, at the time of the Loan Agreement, Mr. Turlington had no valuable collection remedies that he eschewed by entering into the Loan Agreement. He did not have (and never had) a deed of trust on the Property; his only remedy was to sue

Mr. Grover. He still has that remedy available to him. Though he did not receive all of the pieces of artwork to which the Loan Agreement entitled him, he still collected 24 pieces, putting him in a better position than he enjoyed absent the Loan Agreement. In other words, Mr. Turlington cannot show that he sustained damages by entering into the Loan Agreement in reliance upon Mr. Grover's representations. Accordingly, the court finds and concludes that Mr. Turlington has not satisfied his burden of proving that Mr. Grover's debt is nondischargeable under section 523(a)(2)(A) based on Mr. Grover's misrepresentation in the Loan Agreement concerning the availability of artwork to serve as Mr. Turlington's collateral.

### d. Exception to Discharge under 11 U.S.C. § 523(a)(6)

Section 523(a)(6) states that "a discharge . . . does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity . . ." 11 U.S.C. § 523(a)(6). The injury itself must be deliberate or intentional, and not merely a deliberate or intentional act that leads to injury. <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61-62 (1998). Thus, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." <u>Id.</u> at 64.

Section 523(a)(6) requires application of a two-pronged test: a plaintiff must prove by a preponderance of the evidence that the debtor's conduct in causing the injuries was both willful and malicious. <u>Carillo v. Su</u> (<u>In re Su</u>), 290 F.3d 1140, 1146-47 (9th Cir. 2002). To prove willfulness, a plaintiff must establish that "the debtor has a subjective motive to inflict

Case: 16-05083   Doc# 53   Filed: 04/25/18   Entered: 04/25/18 11:11:49   Page 23 of 27

injury or [] the debtor believes that injury is substantially certain to result from his own conduct." Id. at 1142. The debtor must have intended the consequence of the act, not just the act itself. Id. at 1146–47. To prove maliciousness, a plaintiff must demonstrate that "the injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." Id. (internal quotation marks and citation omitted). If the plaintiff proves willfulness, the court may infer malice from the wrongful nature of the act itself. Thiara v. Spycher Bros. (In re Thiara), 285 B.R. 420 (B.A.P. 9th Cir. 2002). Courts must, however, narrowly construe section 523(a)(6) in favor of the debtor. In re Riso, 978 F.2d at 1154.

### i. Willfulness

Mr. Turlington did not meet his burden of demonstrating that Mr. Grover had a subjective motive to inflict injury or believed that injury was substantially certain to result from his own conduct. Both parties were excited about and invested in making the Golden State Theater a success. Mr. Turlington lent money to Mr. Grover for the specific purpose of keeping the Golden State Theater operational and paying the performers, and the evidence shows Mr. Grover used the money for that purpose.

Mr. Turlington has not shown that Mr. Grover extracted money from him without ever intending to pay it back, or that Mr. Grover knew that the Property offered as security for the loans (but never actually used as security) had no equity. Mr. Turlington introduced no evidence to suggest that Mr. Grover

Case: 16-05083   Doc# 53   Filed: 04/25/18   Entered: 04/25/18 11:11:49   Page 24 of 27

1  would not have repaid the loans had the Golden State Theater been

2  successful.

3      As to the Loan Agreement, although Mr. Grover misrepresented

4  the availability of collateral, Mr. Turlington did not

5  demonstrate that he did so to inflict injury or knew that injury

6  was substantially likely to occur because of the

7  misrepresentation.  Mr. Turlington had already parted with his

8  money at the time of the Loan Agreement.  As discussed above, Mr.

9  Grover's misrepresentation about the collateral did not cause Mr.

10 Turlington injury; Mr. Turlington ultimately improved his

11 position via the Loan Agreement by securing payment of part of

12 the loan balance through the artwork he took.  Because Mr.

13 Turlington has not proven the element of willfulness by a

14 preponderance of the evidence, the court finds and concludes that

15 Mr. Turlington has not made case for nondischargeability of the

16 loans under section 523(a)(6).

17          **ii. Maliciousness**

18     Mr. Turlington also did not prove that Mr. Grover acted

19 maliciously.  With respect to Mr. Grover's misrepresentation that

20 the loans were "safe and secure" because they could be secured

21 the Property, Mr. Turlington has not demonstrated that Mr. Grover

22 intended to misrepresent the available equity in the Property.

23 As discussed above, the evidence shows that Mr. Grover was not

24 aware of the Cedar Funding deed of trust.  With respect to Mr.

25 Grover's misrepresentation of available collateral in the Loan

26 Agreement, Mr. Turlington has not demonstrated that the

27 misrepresentation caused him injury.  Mr. Turlington took no

28 affirmative action and did not waive any rights in reliance on

the Loan Agreement. Because Mr. Turlington has not shown that Mr. Grover acted maliciously, the court finds and concludes that Mr. Turlington has not made a prima facie case for nondischargeability of the loans under section 523(a)(6).

## V.  CONCLUSION

For the foregoing reasons, the court rules in favor of Mr. Turlington on his claim for relief under section 523(a)(3)(B) finding the complaint and FAC to be timely, and rules against Mr. Turlington and in favor of Mr. Grover on the claims for relief under sections 523(a)(3)(A), 523(a)(2)(A), and 523(a)(6).  The court further rules that the outstanding debt owed to Mr. Turlington by Mr. Grover is $48,799.45, plus post-judgment interest of 2.18% in accordance with 28 U.S.C. § 1961(a).  Each of the parties shall bear his own fees and costs.  The court will enter judgment consistent with this memorandum decision.

**\*\*END OF ORDER\*\***

## Court Service List

[None]